UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

WILLIAM N. ARMOUR,

          *Plaintiff*,

*v*.

COMMISSIONER OF SOCIAL SECURITY,

          *Defendant*.

_____/

CASE NO. 17-cv-13671

DISTRICT JUDGE THOMAS L. LUDINGTON
MAGISTRATE JUDGE PATRICIA T. MORRIS

## REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT (Docs. 12, 13)

I.    **REPORT**

      **A. Introduction and Procedural History**

      This is an action for judicial review of a final decision by the Commissioner of Social Security denying Plaintiff William N. Armour's claim for Disability Insurance Benefits ("DIB") under Title II, 42 U.S.C. § 401 *et seq*. *See* (Doc. 1). Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to the undersigned Magistrate Judge. (Doc. 3). The matter is currently before the Court on cross-motions for summary judgment. (Docs. 12, 13).

      On April 14, 2015, Plaintiff filed a DIB application alleging disability beginning February 18, 2015. (PageID.45). Plaintiff will remain insured through December 31, 2019. (*Id.*). After the Commissioner denied his claim, Plaintiff requested a hearing, (PageID.128-129), which was held before Administrative Law Judge ("ALJ") Crystal L. White-Simmons on November 3, 2016 (PageID.60-95). Ultimately, the ALJ found that

Plaintiff had not been under a disability during the relevant time period, (PageID.42-58), and the Appeals Council, after reviewing additional exhibits, denied Plaintiff's request for review.[1] (PageID.29-34). This action followed.

### B. Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (internal citations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).

The court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989). The court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of

---

[1] In the Sixth Circuit, where the Appeals Council considers additional evidence but denies a request to review the ALJ's decision, since it has been held that the record is closed at the administrative law judge level, any "AC" exhibits submitted to the Appeals Council are not part of the record for purposes of judicial review. *See Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996); *Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993). Therefore, since district court review of the administrative record is limited to the ALJ's decision—the final decision of the Commissioner—the court can consider only evidence presented to the ALJ. In other words, Appeals Council evidence may not be considered for the purpose of substantial evidence review.

2

credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994).

If the Commissioner's decision is supported by substantial evidence, "it must be affirmed

even if the reviewing court would decide the matter differently and even if substantial

evidence also supports the opposite conclusion." *Id*. at 286 (internal citations omitted).

### C. Framework for Disability Determinations

Under the Act, "DIB and SSI are available only for those who have a 'disability.'"

*Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any
> medically determinable physical or mental impairment which
> can be expected to result in death or which has lasted or can be
> expected to last for a continuous period of not less than
> [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).    The

Commissioner's regulations provide that disability is to be determined through the

application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If
> you are doing substantial gainful activity, we will find that you
> are not disabled. . . .

> (ii) At the second step, we consider the medical severity of your
> impairment(s). If you do not have a severe medically
> determinable physical or mental impairment that meets the
> duration requirement . . . or a combination of impairments that
> is severe and meets the duration requirement, we will find that
> you are not disabled. . . .

> (iii) At the third step, we also consider the medical severity of
> your impairment(s). If you have an impairment(s) that meets
> or equals one of our listings in appendix 1 of this subpart and
> meets the duration requirement, we will find that you are
> disabled. . . .

> (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled. . . .
>
> (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). A claimant must establish a medically determinable physical or mental impairment (expected to last at least twelve months or result in death) that rendered her unable to engage in substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D. ALJ Findings

Following the five-step sequential analysis, the ALJ concluded that Plaintiff had not been under a disability from his alleged onset date of February 28, 2015, through the date

of the decision, January 24, 2017. (PageID.45, 55). First, the ALJ found that Plaintiff had

not engaged in substantial gainful activity since his alleged onset date. (PageID.47). Next,

the ALJ determined that Plaintiff had the following severe impairments: osteoarthritis of

the right knee; shoulder degenerative joint disease with a tear of the left supraspinatus

tendon; obesity; degenerative disc disease of the spine; cervical radiculopathy; and cervical

spondylosis. (*Id.*). Additionally, she found Plaintiff had nonsevere impairments "including

hypertension, scoliosis, and cerebral trauma." (*Id.*). Plaintiff did not, however, have an

impairment or combination of impairments that met or medically equaled the severity of a

listed impairment. (PageID.48-49). The ALJ concluded that Plaintiff had the residual

functional capacity ("RFC") to

> perform light work as defined in 20 CFR 404.1567(b) except the claimant
> cannot climb ladders, ropes, or scaffolds. The claimant can occasionally
> climb ramps or stairs. The claimant can occasionally balance, stoop, and
> c[r]ouch, but cannot kneel or crawl. The claimant cannot perform constant
> flexion, extension or rotation of the neck. The claimant can frequently push,
> pull, and operate foot controls with right lower extremity and he can
> frequently reach overhead, handle, finger and feel with the left upper
> extremity. The claimant can have no exposure to unprotected heights. The
> claimant also must be able to change from standing to sitting or from sitting
> to standing after an hour.

(PageID.50). Plaintiff was unable to perform his past relevant work as a patient transporter,

but the ALJ found that considering Plaintiff's age, education, work experience, and RFC,

jobs that Plaintiff could perform existed in significant numbers in the national economy.

(PageID.53-54).

### E.  Administrative Record

#### 1.        Medical Evidence

The Court has thoroughly reviewed Plaintiff's medical record. In lieu of summarizing his medical history here, the Court will make reference and provide citations to the record as necessary in its discussion of the parties' arguments.

#### 2.        Application Reports and Administrative Hearing

##### i.        Plaintiff's Function Report

The record contains an undated function report from Plaintiff. (PageID.224-231). He reported that he lived in a house with family. (PageID.224). Plaintiff had attempted to return to work but had been unable to because of his severe, constant pain. (PageID.231). His pain increased when "moving constantly or sitting for long periods of time," and he was "[u]nable to push, pull or lift more than 20 [pounds] without causing [himself] more pain." (*Id.*). Further, he tended to "get very frustrated and stressed" when in pain. (PageID.230).

Plaintiff indicated the following were affected by his illnesses, injuries, or conditions: lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, completing tasks, and using hands. (PageID.230). He explained: "I can only lift up to 20 [pounds]. I'm usually in too much pain to do a lot of walking, bending, standing[,] and reaching. It takes [me] a lot longer to complete tasks." (*Id.*). By Plaintiff's estimate, he could walk about half a block before needing to rest for ten minutes. (*Id.*). But Plaintiff had no problem paying attention, finished what he started, and followed written or spoken instructions "very well." (*Id.*).

He attended physical therapy two to three times a week, and on other days did the recommended exercises at home. (PageID.225). Still, "[a] lot of times," his "serious pain levels" would wake him up every two to three hours at night. (*Id.*).

As for his ability to perform personal care tasks, he indicated difficulty only with dressing and bathing due to limited use of his left arm; he also stated he had "problems stepping into [the] tub." (*Id.*). He had no difficulties caring for his hair, shaving, feeding himself, or using the toilet. (*Id.*).

He prepared his own meals daily in the form of sandwiches and microwavable meals, taking about fifteen to thirty minutes to do so. (PageID.226). He indicated that his cooking habits had changes since his illness, injuries, or conditions began, but did not explain further. (*Id.*).

He was able to wash dishes and do "light cleaning" for fifteen to thirty minutes daily before severe back, neck, and shoulder pain set in. (PageID.226). He was able to go outside daily by himself, either driving or riding in a car. (PageID.227). About once a week, he spent an hour shopping for food, clothes, and household supplies in stores, by phone, or by computer. (*Id.*). No obstacles presented themselves to his paying bills, counting change, handling a savings account, or using a checkbook or money orders. (*Id.*).

Reading, watching television, and spending time with his children numbered among his hobbies, which he did "very often and well." (PageID.228). The only change in those activities since onset was that he could not sit "for [an] extended period of time." (*Id.*). He spent time with his children and talked to friends on the phone about twice a week, and attended church and lodge meetings most weekends, though he said he did not go as many

7

places or do as many things as he used to. (PageID.228-229). He had no problems getting along with others. (PageID.229).

Lastly, Plaintiff noted that he used glasses and a shoe lift every day. (*Id.*). He took medication but did not experience any side effects. (PageID.231).

### ii.    Plaintiff's Testimony at the Administrative Hearing

On November 3, 2016, Plaintiff appeared before ALJ Crystal L. White-Simmons for his administrative hearing. (PageID.60-95). Answering the ALJ's questions, he explained he was divorced and had been living with his mother for about four years. (PageID.65-66). Climbing the stairs to their flat sometimes caused him "issues" depending on the pain in his back and right knee. (PageID.66).

At the time of the hearing, Plaintiff was working twenty-four to twenty-six hours a week at Walmart as a cashier. (PageID.66-67). He had initially been training at forty hours a week, but had informed his employer that it was "too painful to stand there"; two weeks prior to the hearing, he "went in to resign because it was just too hard to stand doing cashiering," but ended up staying on "working on the floor" in the cosmetics department. (PageID.67).

Prior to his job at Walmart, Plaintiff had last worked as a patient transporter from February 1998 to February 2015. (PageID.70-71). He transported patients throughout a hospital or medical center on beds or stretchers or in wheelchairs. (PageID.72). He estimated that the most he had to lift was about 250 pounds, when he needed to pull a patient by himself. (PageID.72). Plaintiff essentially left the position after he injured his shoulder "pulling a bed with a patient in it," though he technically remained employed as

8

a patient transporter until December 2015, when the company informed him it "couldn't find [him] another position" and let him go. (PageID.72-73). He did not work again until he began working at Walmart in August 2016. (PageID.73).

Plaintiff said he was prevented from working full time by "[a] lot of pain" in his back, lower back, left shoulder, and knee. (PageID.73-74). He rated his back pain at the moment as a three, with one being "not that bad" and ten "excruciating." (PageID.74). Three was "about the average" when he was "not doing anything." (pageID.75). At its worst, the pain had gotten as bad as ten and he had been unable to move from his bed for two days. (PageID.75). The pain would strike "out of the blue," when he "would turn or bend down and . . . [his] back will just go out." (PageID.75).

His left shoulder pain he rated at about a two, which he said was also typical for him. (PageID.75-76). The worst pain he had experienced in his shoulder was about a seven, brought on by "nothing in particular." (PageID.78). Periodically he received injections in his shoulder that provided relief lasting about two months, though he needed to wait longer to receive the next injection; his last injection had been two weeks prior. (PageID.76). He also sometimes received injections for pain in his neck. (*Id.*). Even with the injections, neither his pain nor the tingling in his left hand ever completely dissipated. (PageID.76-77). He took Lyrica for the tingling, but reported that it did not work "at all," and his doctors had advised him "the only thing . . . that will work is probably surgery" for the pinched nerve in his neck, after which he could expect six months of recovery. (PageID.77). He had attended physical therapy for his shoulder earlier that year, but "insurance only covers so

9

much physical therapy"—besides which, he said, the therapy did "[n]ot really" help. (PageID.82).

Additionally, Plaintiff testified to pain in his right knee that was "constantly at about a five or a six," but "standing at Walmart[,] . . . about a seven or eight." (PageID.78-79). Before he had begun working at Walmart, it had been "maybe a two or a three." (*Id.*). Walmart did not allow him to use a stool to sit while cashiering. (*Id.*). Plaintiff explained he was "supposed to start physical therapy" for his knee, but that the physical therapist had not called him back. (PageID.81).

Plaintiff's Lyrica sometimes caused sleepiness and dizziness. (PageID.79). He also took Motrin and Norco, which helped, though he could not take both simultaneously. (PageID.80). He reported he was "trying not to" take Motrin, though he still had a prescription for it. (*Id.*). He also took blood pressure medication and medication that "somewhat" helped keep his heart from beating fast. (PageID.81). Although he had walked with a limp for forty-five years, Plaintiff did not use a cane, a walker, or any other assistive device. (*Id.*).

Plaintiff's last emergency room visit had been the previous year, when his "sugar" and blood pressure dropped due to his hypoglycemia. (PageID.80). He stated he was not diabetic but that "the reason for [his] blood pressure dropping, . . . they still don't know." (PageID.81).

Speaking to his physical limitations, Plaintiff testified that he could lift about ten to fifteen pounds; any more would cause back and shoulder pain. (PageID.82). He explained that when doing laundry, he had to make multiple trips to the laundromat to avoid carrying

too much weight. (PageID.83). In his position at Walmart, he could stand up to two hours before taking a scheduled break of either fifteen minutes or lunch. (*Id.*). During that time, he would usually sit in a nearby restaurant, since the break room was "all the way in the back of the store." (PageID.83). He could walk about a block or a block and a half without pain; he did not have to walk farther to reach a bus stop. (PageID.84).

Stooping, kneeling, crouching, crawling, and bending all caused him knee and back pain. (*Id.*). He estimated he could sit for an hour to an hour and a half before he started having back pain and would need to stand for about ten minutes. (*Id.*). Though Plaintiff sometimes experienced tingling in his left (non-dominant) hand, he stated he had no problem using his hands, including for grabbing, picking up, or holding on to objects. (PageID.84-85). Additionally, Plaintiff testified that due to a brain injury at age three, "the whole right side of [his] body is smaller than the left side . . . and weaker." (PageID.85).

Plaintiff's work schedule fluctuated, but on an average day he would wake up around 7 in the morning and do some chores around the house, such as washing dishes. (PageID.86). He did the laundry every two weeks or so, and shared cooking and grocery shopping duties with his mother. (PageID.86-87). Self-care such as showering and dressing presented no obstacle. (PageID.87). He and his mother both took care of vacuuming, sweeping, mopping, and similar, though he took on more responsibility because his mother's health was worse. (*Id.*).

He went to church and socialized with friends and family on a regular basis, although he would not get up to do so if his back was in pain, and he enjoyed reading,

watching sports, and watching television. (PageID.87). He did not have any issue maintaining his attention or focus throughout the day. (*Id.*).

Plaintiff did not drive because his license was suspended. (PageID.67-68). Instead, he took the bus or depended on rides from his mother or friends. (PageID.68).

Plaintiff had completed two years of college; he had been enrolled in a special education class at age four but it was thereafter determined he "didn't need it." (PageID.68-69).

Questioning by Plaintiff's representative elicited that Walmart accommodated him with an extra break or "a little longer" break if he needed one. (PageID.88). He had good days and bad days. (*Id.*). Since starting work at Walmart several months prior, he had called in three or four times on days when he was in pain. (PageID.89).

In closing, Plaintiff stated: "I'm not here looking for a handout because if I could work full-time, I would. I've been working since I was 15 and now my body . . . has gotten a lot worse . . . , and I'm still trying to . . . take care of my children because I'm, currently I'm paying child support for my 17 . . . and 12 year old." (PageID.89).

### iii.    The Vocational Expert's Testimony at the Administrative Hearing

Vocational Expert ("VE") Amelia Shelton also testified at the administrative hearing. (PageID.90). She began by classifying Plaintiff's past work as Patient Transporter (medium work, "may have risen to the very heavy duty level") and as Cashier II (light work). (*Id.*). The ALJ decided to consider Plaintiff's patient transporter position as past relevant work. (*Id.*).

The ALJ then posed her first hypothetical:

[A]ssume a hypothetical individual of the claimant's age and education, and with the past work as . . . described. Further assume that the individual is limited to a light exertion level with no climbing of ladders, ropes, or scaffolds, occasional climbing of ramps and stairs, occasional balancing, stooping, and crouching with no kneeling or crawling, no constant flexion, rotation, or extension of the neck, frequent pushing, pulling, and operation of foot controls with the right lower extremity, frequent overhead reaching, handling, fingering, and feeling with the left upper extremity, and no unprotected heights.

(PageID.90-91). The VE stated that the hypothetical individual would not be able to perform Plaintiff's past relevant work, but could perform the following positions: Marker (161,000 jobs in the national economy); Bench Assembler (166,000 jobs in the national economy); and Assembler, Production (166,000 jobs in the national economy). (PageID.90).

For her second hypothetical, the ALJ added a sit/stand option "after an hour," in addition to the previously enunciated limitations. (PageID.91). The VE stated that the three jobs she had described would remain available, although the numbers would be reduced by fifty percent, leaving 81,000 positions as Marker, 83,000 positions as Bench Assembler, and 83,000 jobs as Assembler, Production. (PageID.92).

The ALJ then altered the hypothetical so that the individual would be restricted to sedentary jobs. (*Id.*). The VE responded that the following positions would be available: Final Assembler (100,000 jobs in the national economy); Table Worker (20,000 jobs in the national economy); and Nut Sorter (10,000 jobs in the national economy). (*Id.*). If in addition to the previous limitations, the hypothetical individual would be absent two or more days per month, however, no work would be available. (*Id.*).

13

The VE clarified that all her testimony was in accordance with the Dictionary of Occupational Titles, except for her testimony as to the sit/stand option and absenteeism, which were according to her professional experience. (PageID.92-93).

Plaintiff's representative then asked the VE whether the results of any hypothetical would change if the individual could only occasionally bend or stoop, reach, reach over shoulder, grasp bilaterally, push, and pull. (PageID.93). The VE responded that the occupations she had cited required frequent reaching. (*Id.*).

The VE stated one position would be available with a sit/stand option at the light duty range with occasional reaching, handling, and fingering: Counter Clerk (27,000 jobs in the national economy). (PageID.94). At the sedentary duty range, one position would offer occasional reaching, handling, and fingering in additional to all the other postural limitations: Call Out Operator (13,000 jobs in the national economy). (*Id.*).

As a final matter, the VE testified that being off-task twenty percent of the work day or absent two or more days per month would be work preclusive, in her professional experience. (PageID.95-96).

### F.  Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into categories: "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* §

14

404.1513(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006). Both acceptable and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id*. When acceptable medical sources issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure her RFC. *Id.* § 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Certain opinions of a treating physician receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are

"not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *see also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the person's RFC, or the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to a treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996); *see also Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1 (6th Cir. 1995).

The claimant must provide evidence establishing his RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability

16

unless he furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A); *see also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most he can still do despite his limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2).

### G. Analysis

Here, Plaintiff contends the ALJ erred by (1) failing to give sufficient weight to the opinion of Dr. Katrice Herndon; (2) failing to consider that Plaintiff's "persistent efforts" to obtain pain relief enhanced his credibility; (3) failing to consider the effects of Plaintiff's scoliosis, herniated disc, and sciatic nerve damage in his back; and (4) finding Plaintiff able to perform light work with additional limitations, despite evidence to the contrary. (Doc. 12).

### 1. The Treating Source Rule

First, Plaintiff argues that the ALJ violated the treating source rule because she "minimized the weight allocated to Plaintiff's medical providers"—his use of the plural, however, is belied by the fact that Plaintiff names only one wronged physician, Dr. Katrice Herndon. (Doc. 12 at PageID.656-657).

Certain opinions of a treating physician receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *see also Wilson*, 378 F.3d at 544. The regulations mandate that the ALJ provide "good reasons" for the weight assigned to a treating source's opinion in the written

determination. 20 C.F.R. § 404.1527(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007).

Specifically, Plaintiff takes issue with the ALJ's treatment of a May 20, 2016, letter penned by Dr. Herndon in which she stated Plaintiff "suffered an injury to his neck and shoulder at work in February 2015," and that imaging had shown interval progression of disc degenerative disease and moderate to severe foraminal stenosis at multiple levels. (PageID.436). Further, he had a rotator cuff tear of his left shoulder. (*Id.*). She concluded: "Mr. Armour is unable to work at this time. . . . He should not push, pull[,] or carry anything greater than 15 lbs. During his treatment and therapy, patient is advised not to work in any position." (*Id.*).

The ALJ ultimately properly disregarded Dr. Herndon's opinion that Plaintiff was disabled because the matter was reserved to the Commissioner, citing 96-5p. (PageID.53). *See* 20 C.F.R. § 404.1527(d) ("Opinions that you are disabled" are "not medical opinions" but "instead" are "opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case")[2]; *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 651 (6th Cir. 2009) (finding the ALJ may give "no weight" to medical source statements on issues "reserved exclusively to the Commissioner"). The ALJ gave the rest of the doctor's letter "only limited weight" because it was "not clear whether this was a permanent restriction or meant for the duration of the claimant's therapy." (*Id.*). Plaintiff makes no attempt to address the ALJ's reasoning for discounting Dr. Herndon's opinion,

---

[2] The rules in § 404.1527 apply for claims filed before March 27, 2017, as Plaintiff's was. For claims filed on or after that date, the rules in § 404.1520c apply. 20 C.F.R. § 404.1527.

nor does he present any reasons the ALJ should have assigned more weight to her opinion. Neither has Plaintiff demonstrated that Dr. Herndon's limitations were intended to persist for at least twelve months. *See Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2002) (plaintiff carries the burden to prove disability); *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999) (same); *see also Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) ("It is not unreasonable to require the claimant, who is in a better position to provide information about his own medical condition, to do so."). Indeed, the limitations seem by their terms to be temporary—only "at this time" and "[d]uring his treatment and therapy." (PageID.436). The ALJ reasonably understood these limitations to be temporary, and Plaintiff has not meaningfully challenged the ALJ's determination. *See e.g., Davis v. Comm'r of Soc. Sec.*, 2012 WL 892446, at *7 (W.D. Mich. 2012) (finding it reasonable for an ALJ to view a physician's lifting restrictions as temporary where, inter alia, the limitations were provided four months after the plaintiff's surgery); *Todd v. Comm'r of Soc. Sec.*, No. 1:16-CV-541, 2017 WL 715752, at *4 (S.D. Ohio Feb. 23, 2017) (disregarding limitations imposed in discharge summary where no indication the restrictions were an assessment of plaintiff's long-term functional capacity), *report and recommendation adopted*, No. 1:14CV541, 2017 WL 978590 (S.D. Ohio Mar. 14, 2017).

Plaintiff further complains that the ALJ weighed his decision to decline neck surgery against him. (Doc. 12 at PageID.657). Not only was that irrelevant to the ALJ's assignment of limited weight to Dr. Herndon's opinion, but it was also an appropriate consideration. *See Takemoto-Boyd v. Comm'r of Soc. Sec.*, No. [0]9-CV-10329, 2010 WL

19

1286461, at *7 (E.D. Mich. Feb. 25, 2010) (ALJ appropriately weighed conservative treatment and lack of surgery against plaintiff's claim of disability).

For the above reasons, I suggest the ALJ's application of the treating source rule is not a basis for remand.

### 2.  Plaintiff's Credibility

Plaintiff's next argument is somewhat confused. Though the heading avers his "persistent efforts to obtain pain relief" should have "enhanced his credibility as set forth in SSR 96-7p," and he cites SSR 96-7p at length, he does not actually proceed to challenge the ALJ's credibility determination. (Doc. 12 at PageID.658-659). I therefore consider this argument waived. *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.") (internal citation and quotation omitted).

Instead, Plaintiff appears to take issue with the ALJ's finding that his chronic pain was not in and of itself a medically determinable impairment—"chronic pain syndrome"—but merely a "purely subjective complaint." (Doc. 12 at PageID.658) (referring to PageID.48). Plaintiff asserts that the ALJ's statement that "[t]he diagnosis of a purely subjective complaint does not convert the purely subjective complaint into a medically determinable impairment' is incongruent with the overwhelming weight of medical evidence and authority associated with Plaintiff's disability claim file." (PageID.48). Further, he claims, the ALJ's RFC determination is compromised because the ALJ "did

20

not appear to consider Plaintiff's long-standing complaints of chronic and pervasive pain and its effect on his physical limitations, or the accommodations made to engage in substantially gainful work activities."[3] (Doc. 12 at PageID.659).

But it is correct that a medically determinable impairment may not be established solely on the basis of a claimant's subjective symptoms. 20 C.F.R § 404.1528(a). The Social Security Act defines a "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are *demonstrable by medically acceptable clinical and laboratory diagnostic techniques*." 42 U.S.C. § 423(c)(3) (emphasis added). And regardless, the ALJ did in fact acknowledge Plaintiff's "long-standing complaints of chronic and pervasive pain"—for example, noting that he "has a history of chronic back pain [and] right knee pain," (PageID.51), that records from November 2014 noted "he had been complaining for at least a year of back pain," (*id.*), and that he had "been treated with pain medication, pain injections and physical therapy," (PageID.52).

Moreover, the ALJ explicitly stated that "[a]dditional limitations were added to prevent the exacerbation of the claimant's combination of impairments, to prevent the claimant's pain, and due to the side effects from pain medication." (PageID.53). Because Plaintiff is silent on the subject of how his RFC is inadequate to account for his chronic pain, I suggest any error is harmless. *Thomas v. Comm'r of Soc. Sec.*, No. 15-13291, 2017

---

[3] It is unclear to what "accommodations made to engage in substantially gainful work activities" Plaintiff refers. The only accommodations mentioned in the record were made at Plaintiff's part-time job at Walmart, (PageID.88), which was not substantially gainful activity, (PageID.47).

WL 927623, at *7 (E.D. Mich. Feb. 17, 2017) ("Plaintiff has the burden of demonstrating that his RFC is insufficiently restrictive.") (citing *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994)); *Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 423 (6th Cir. 2008).

### 3. Plaintiff's Alleged Scoliosis, Herniated Disc, and Sciatic Nerve Damage

Similarly, Plaintiff argues that the ALJ violated 96-8p by failing to consider the effects of his scoliosis, herniated disc, and sciatic nerve damage in his back on his ability to work. SSR 96-8p dictates that the ALJ must, when crafting a claimant's RFC, "consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'"  SSR 96-8p (S.S.A.), 1996 WL 374184.

The ALJ determined Plaintiff's scoliosis to be a non-severe impairment. (Doc. 47). As the ALJ noted, Plaintiff's scoliosis appeared to be managed conservatively, and Plaintiff did not report any back surgeries. (PageID.48). But the ALJ then explicitly "considered all 'severe' and non 'severe' impairments in formulating the following residual functional capacity . . . and, where appropriate, . . . included limitations to address the claimant's non 'severe' impairments and subjective complaints like chronic pain." (PageID.48). Thus, I suggest the ALJ did not violate SSR 96-8p as regards Plaintiff's scoliosis.

The ALJ also noted that Plaintiff alleged in his disability report that his ability to work was limited, in part, by his "herniated disc in lower back," "sciatic nerve damage in lower back," and "nerve damage in left arm with weakness." (PageID.50) (citing PageID.205). She did not, however, find that either his nerve damage or his herniated disc

was a medically determinable impairment—at least, neither is mentioned in her discussion of Plaintiff's severe and non-severe impairments. (PageID.47-48).

The Sixth Circuit applies a *de minimis* standard to determine whether an ailment crosses the threshold to be a non-severe impairment. The principle aim of its application is to "screen out those claims that are 'totally groundless' solely from a medical standpoint." *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (citation omitted). Plaintiff has not meaningfully challenged the determination that neither his nerve damage nor his herniated disc rose to the level of a medically determinable impairment. He provides not one citation to support the existence of such impairments or related limitations, but instead simply quotes WebMD's generic descriptions of scoliosis, nerve damage, and herniated discs. (Doc. 12 at PageID.661). Nor does he explain how the RFC was inadequate to account for those limitations, or what additional limitations might be required.

Regardless, the undersigned found no mention of nerve damage in Plaintiff's medical records, and little evidence that Plaintiff suffered from a herniated disc at all, let alone that it affected his ability to work. Plaintiff mentioned a herniated disc in his own testimony, (PageID.74); his medical records from Health Centers Detroit Medical Group (Dr. Herndon) all contain the same sentence that he had "a history of . . . a herniated disc," among other conditions, without ever assessing him with a herniated disc at present, (PageID.407, 409, 411, 413); and an April 2015 MRI history form included the notation "Diagnosis: disc herniation," (PageID.295), though a same-day MRI did not find a herniated disc, (PageID.296). Lastly, Plaintiff self-reported that "sethi DR" had found a

herniated disc in his back at some time between 2010 and November 2014. (PageID.210). The undersigned failed to unearth any record of visits to a person or location named Sethi.

At bottom, even if the ALJ had determined that Plaintiff's nerve damage or herniated disc were medically determinable impairments, the RFC would not change because Plaintiff did not identify any limitations from those impairments and the record contained no evidence that any exist. *See Hatton v. Comm'r of Soc. Sec.*, 2018 WL 1278916, at *7 (E.D. Mich. Feb. 14, 2018) (finding no reversible error where even if the ALJ had found Plaintiff's COPD and heart palpitations were medically determinable impairments, the RFC would not change because the record did not contain credible evidence of functional limitations caused by those impairments), *report and recommendation adopted*, 2018 WL 1254948 (E.D. Mich. Mar. 12, 2018); *Easterday v. Comm'r of Soc. Sec.*, 2016 WL 5422101, at *8 (E.D. Mich. Aug. 19, 2016) (finding no reversible error in ALJ's decision that diagnosed depression was not a medically determinable impairment because the 'existence of a diagnosis [did] not suggest functional limitations. Indeed, plaintiff bears the burden of proof at step two and has not come forward with any evidence of mental impairment that is more than a 'slight abnormality that minimally affects work ability . . . .'") (citing *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988)).

I therefore suggest that the ALJ's decision not to account for Plaintiff's alleged herniated disc and nerve damage in his RFC was, at most, harmless error.

### 4. Substantial Evidence

Lastly, Plaintiff points to evidence in the record that he is unable to perform light work with his physical limitations. (Doc. 12 at PageID.661-662). Specifically, he draws the Court's attention to Dr. Herndon's Physical Capacities Assessment stating that Plaintiff can never bend, stoop, squat, kneel, climb, or push or pull, and can only occasionally walk or stand. (Doc. 12 at PageID.662). As explained above, however, the ALJ supportably assigned limited weight to Dr. Herndon's opinion.

In addition, Plaintiff relies on Dr. Mahmoud Sabbaugh's assessment that Plaintiff can perform sedentary work only occasionally and can never perform light work. (Doc. 12 at PageID.662). But he does not challenge the ALJ's assignment of only "some weight" to Dr. Sabbagh's letter. Nor does he challenge the ALJ's reliance on the opinion of state agency consultant Dr. Milagros Flores, who found Plaintiff *could* perform the standing/walking requirement. (PageID.52-53) (referring to PageID.98-107). It is irrelevant whether Plaintiff can point to substantial evidence that would support a decision different from the ALJ's, so long as the ALJ's decision is also supported by substantial evidence. *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994).

Here, the ALJ thoroughly discussed Plaintiff's medical record. (PageID.50-53). She noted that Plaintiff's activities of daily living were "not consistent with disabling symptoms and limitations," remarking on Plaintiff's ability to work 22 to 26 hours a week at Walmart, handle his personal care, cook, and do light chores like washing dishes. (PageID.52). Further, he could go shopping, pay bills, and handle money, and he enjoyed spending time with his children, reading, and watching television. (*Id.*). He was able to ambulate

effectively without any assistive devices. (*Id.*). Further, the ALJ explained her rationale for affording only "limited" or "some" weight to parts of Dr. Herndon's and Dr. Sabbagh's opinions. (PageID.53).

For all of the above reasons, I suggest the ALJ's opinion is supported by substantial evidence.

## II.   <u>RECOMMENDATION</u>

For the reasons stated above, the Court **RECOMMENDS** that Plaintiff's Motion for Summary Judgment, (Doc. 12), be **DENIED**, the Commissioner's Motion for Summary Judgment, (Doc. 13), be **GRANTED**, and this case be **DISMISSED**.

## III.   <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); see also 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to

26

be served upon this magistrate judge. Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  September 18, 2018                    S/ PATRICIA T. MORRIS
                                             Patricia T. Morris
                                             United States Magistrate Judge


## CERTIFICATION

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: September 18, 2018                    By s/Kristen Castaneda
                                            Case Manager